571 So.2d 133 (1990)
STATE ex rel. David Hill LAWRENCE
v.
Larry SMITH, Warden, Louisiana State Penitentiary.
No. 90 KP 0470.
Supreme Court of Louisiana.
December 3, 1990.
*134 Ginger Berrigan, Garvel, Brady & Berrigan, Alexandria, for State ex rel. David Hill Lawrence, plaintiff-applicant.
Willian E. Tilley, Dist. Atty., Asa A. Skinner, Leesville, for Larry Smith, defendant-respondent.
WATSON, Justice.
Lawrence was convicted in 1978 of the second degree murder of his wife and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. His conviction was affirmed on appeal. State v. Lawrence, 365 So.2d 1356 (La.1978), cert. denied, 444 U.S. 846, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979).
An application for postconviction relief was filed last year in the trial court claiming insufficiency of the evidence, improper reference to defendant's postarrest silence, and ineffective assistance of counsel. The trial court denied the application and a writ was granted to consider particularly the sufficiency issue. Defendant's contention is that the evidence was insufficient to prove second degree murder because the mitigating factors of manslaughter were established.

FACTS
David Hill Lawrence, a career sergeant in the Army stationed at Fort Polk, Louisiana, spent the evening of August 26, 1976, drinking beer with several Army friends. Lawrence called his wife between 4:30 and 5:30 P.M. to tell her he would be late getting home. Between 8:30 and 9:30 P.M. he called again to say he was on his way home. During the four hours, Lawrence consumed seven or eight beers. Sergeant John Mahoney was having car trouble and accompanied Lawrence. About 10:00 P.M. the two men arrived at the Lawrence home in Simpson, Louisiana, where they intended to spend the night. Mahoney was a good friend of the couple and had previously stayed overnight at their home.
*135 Sandra Lawrence, David's wife of almost seven years, was furious. After an argument, she attacked David and backed him into the kitchen. A fight ensued. Mahoney was on the verge of leaving the kitchen when he heard a body or bodies hitting the floor. He turned and saw the two struggling on the floor with David on top of Sandra hitting her head on the floor. Mahoney pulled David away from his wife and tried to calm him down. The two men left Sandra lying on the floor of the kitchen and went to the front porch for a cigarette. When Mahoney returned to check on Sandra, she was lying on the kitchen floor breathing heavily. Not realizing that Sandra was seriously hurt, Mahoney left in David's truck. This was the only available transportation, and Mahoney intended to return for David the next morning.
David Lawrence said he spoke to his wife and carried her into the bedroom before falling asleep on the living room couch. When he received a call around 4:20 A.M. advising him that his company had been placed on alert, David went into the bedroom and discovered that his wife was dead. The caller, Donald Wayne Martin, said that David sounded like someone just waking up. After finding Sandra, David called Mahoney and asked him to notify the coroner and sheriff's office. David also telephoned his father, J.W. Lawrence, Jr., about 4:30 A.M. and said: "Sandy is dead." (Tr. 308.) In response to his father's questions, David said he thought he must have killed Sandra when he hit her head on the floor.
Sergeant and Mrs. Lawrence had two children, a boy and a girl, and appeared to have a normal family life. David's aunt, Joy Lynn Lawrence, saw the couple frequently and had never seen them fight or argue. They had attended a family services clinic at Fort Polk because Sandra, a native of Pennsylvania, did not like Louisiana. Sandra was five feet five inches tall and weighed about 112 pounds. David was five feet ten inches tall and weighed about 155 pounds.
Aunt Joy and, a little later, David's father, arrived at the house shortly after David's call and confirmed that Sandra was dead. David was sobbing, and his son, Patrick, was trying to console him. Aunt Joy had never seen her nephew cry. David's father, a retired Army Lieutenant Colonel, said that David was in a state of shock and in no condition to answer questions. Through Aunt Joy, he had advised David to remain silent.
At the time of trial, Lawrence had been in the military ten years and five months. He had served two tours of duty in Vietnam and thirteen months in Korea, receiving eight awards for merit and two unit awards, including a special commendation. He had reached the rank of Sergeant E-5 and served as crew chief on a helicopter.
Lehrue Stevens, Jr., the pathologist who performed the autopsy, said Sandra Lawrence had bruises on her arms and chest, bruising at the neck consistent with strangulation, and a fracture at the base of the skull which extended three inches toward the left ear. The skull fracture resulted from a significant force but could have been caused by a fall in which two people were struggling. Dr. Stevens estimated that death occurred between 10:00 P.M. and midnight.
Pathologist Tom Norman, another expert witness, found no evidence of strangulation and attributed death to the severe skull fracture. Dr. Norman said the fracture could have resulted from a violent fall. According to Dr. Norman, Sandra Lawrence would have been temporarily unconscious but might have regained her senses for a short interval preceding her death. Dr. S.J. Jones, the coroner who examined the body at the scene, testified about the severe massive injury to the head. His estimate of the time of death was between 9:45 and 10:00 P.M.

MANSLAUGHTER
Manslaughter is a responsive verdict to second degree murder. Manslaughter is a homicide committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person *136 of self control and cool reflection. LSA-R.S. 14:31.[1]
Under one line of authority, the Due Process Clause requires the prosecution to prove the absence of heat of passion or sudden provocation when that issue is properly presented in a homicide case. Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Mullaney held a Maine statute unconstitutional which required a defendant to prove heat of passion or sudden provocation in order to reduce murder to manslaughter. See also Reed v. Ross, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). Compare Patterson v. New York, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), which upheld a New York statute requiring a defendant to prove extreme emotional distress to reduce murder to manslaughter. Louisiana has followed the Patterson rule that defendant must prove the mitigating factors of sudden passion or heat of blood to reduce a homicide to manslaughter. State v. Tompkins, 403 So.2d 644 (La.1981); State v. Temple, 394 So.2d 259 (La.1981). The distinction is of no moment here since the evidence clearly proves that the crime resulted from sudden passion and heat of blood.
When the preponderance of the evidence shows that a homicide was committed in sudden passion or heat of blood which would have deprived an average person of his self control and cool reflection, a jury errs in rendering a verdict of second degree murder. State v. Lombard, 486 So.2d 106 (La.1986).
A conviction of second degree murder must be vacated when a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could only have found defendant guilty of manslaughter. State v. Byrd, 385 So.2d 248 (La. 1980); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[2]
Although taller and heavier than his wife and a trained soldier, David Lawrence does not fit the stereotype of the wifebeater who finally goes too far. It was his wife who attacked him and backed him into the kitchen. This does not, of course, excuse the subsequent violence. However, the photographs and evidence do not show the victim in a horribly bruised or battered condition and are consistent with David Lawrence's testimony that he placed his wife on the bed without realizing that she was critically injured.
The evidence indicates that the cause of death, the skull fracture, was sustained when the couple fell to the kitchen floor. There is no evidence of any other cause.
Likewise, there is no evidence that this domestic tragedy was the result of a plan or that David Lawrence had formulated a prior intent to kill his wife. Sandra Lawrence initiated the fight; her husband retreated until he lost his temper and retaliated. Under these circumstances, the provocation was sufficient to have deprived an average person of his self control.
"A preponderance of the evidence clearly shows that defendant committed the offense in a sudden passion or heat of blood caused by a provocation which would have deprived an average person of his self control and cool reflection. No rational trier of fact could have concluded otherwise. Thus, the jury erred when it found defendant guilty of second degree murder. It should have returned a verdict of manslaughter ...
"If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court may modify the verdict *137 and render a judgment of conviction on the lesser included responsive offense." Lombard, 486 So.2d at 111.
It is interesting to note that the prosecution, in closing argument, argued that defendant was guilty of manslaughter. "[T]he State would submit that the evidence that has been adduced from this witness stand should prove to you beyond any doubt that he has committed manslaughter. Why do I say that? Let me define for you Manslaughter." (Tr. 519.)
Lawrence's conviction must be reduced from second degree murder to manslaughter under State v. Byrd, and he must be resentenced.

DOYLE VIOLATION
The jury's verdict that defendant was guilty as charged (of second degree murder) may have been influenced by the prosecutor's reference to defendant's postarrest silence. That reference, a violation of the holding in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), was not considered in defendant's appeal because of a procedural bar (State v. Lawrence, supra ) but may have contributed to the jury's excessive verdict. Since the verdict is being vacated, the issue is pretermitted.
For the reasons assigned, it is ordered that David Hill Lawrence's conviction of second degree murder and sentence to life imprisonment are reversed and vacated; a judgment of conviction of manslaughter is rendered and the case is remanded to the district court for resentencing.
CONVICTION AND SENTENCE REVERSED AND VACATED; JUDGMENT OF GUILTY OF MANSLAUGHTER RENDERED; REMANDED FOR NEW SENTENCING.
LEMMON, J., concurs and assigns reasons.
MARCUS, J., concurs for reasons assigned by LEMMON, J.
CALOGERO, C.J., dissents and assigns reasons.
LEMMON, Justice, concurring.
On relator's insufficiency of evidence claim he is entitled to reduction of his conviction to manslaughter. If relator's claim of a Doyle violation has merit, he could be entitled to a new trial on a charge no greater than manslaughter. However, on this record any Doyle violation at most affected the jury only by causing it to return a verdict of second degree murder rather than manslaughter. There is no reasonable possibility that an acquittal may have resulted but for the alleged Doyle violation. The Doyle violation, if one occurred, was harmless beyond a reasonable doubt. State v. Gibson, 391 So.2d 421 (La. 1980).
CALOGERO, Chief Justice, dissenting:
In this post-conviction matter regarding a 1987 incident, the majority has upset a second degree murder conviction and allowed to stand only a conviction for manslaughter in a case which was affirmed by this court on direct appeal in 1978. State v. Lawrence, 365 So.2d 1356 (La.1978). Because I would find no constitutional violation, applying the sufficiency of the evidence standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), I respectfully dissent.
This court granted defendant's application for post-conviction relief for consideration of two claims: 1) that the evidence supported a verdict of manslaughter and not second degree murder; and 2) that counsel rendered ineffective assistance by failing to take adequate measures when the state exploited defendant's post-arrest silence in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The majority decision pretermits discussion of the Doyle contention after vacating the jury verdict of second degree murder and rendering a judgment of conviction of manslaughter upon its finding that "the evidence clearly proves that the crime resulted from sudden passion and heat of blood." It is this latter finding with which I disagree.
A responsive verdict to second degree murder is manslaughter, defined in part as
*138 "[a] homicide which would be murder ... but the offense is committed in sudden passion or heat of passion of blood sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31. "Sudden passion" or "heat of blood" are mitigatory factors which, if proven by a preponderance of the evidence by the defendant, diminish the degree of culpability and reduce the grade of his offense from murder to manslaughter. Where the defendant asserts that he acted in the heat of passion, "two variables must be weighed in relation to each otherthe degree of provocation and the measures employed by the defendant in response to it." State v. Ross, 28 Utah 2d 279, 501 P.2d 632, 635 (1972). Accordingly, the "provocation must be proportionate to the manner in which the accused retaliated, and the crime is murder when the accused attack[s] the deceased with violence out of all proportion to the provocation...." People v. Neal, 112 Ill.App.3d 964, 68 Ill. Dec. 536, 540, 446 N.E.2d 270, 274 (1983). Where the provocation is not unreasonably excessive and out of proportion to the retaliatory act, the mitigation is established; but where the retaliatory act is unreasonably excessive and out of proportion to the provocation, no mitigation will be recognized. R. Perkins & R. Boyce, Criminal Law, Ch. 2, § 1, p. 86, 91 (3rd Ed. 1982).
In reviewing defendant's claim that he established by a preponderance of the evidence the presence of "sudden passion" and "heat of blood" entitling him to a manslaughter verdict, this court must determine "whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence." State v. Lombard, 486 So.2d 106 (La.1986). In this case, in my opinion, a rational trier of fact could indeed have found that the mitigatory factors were not established by a preponderance of the evidence and that the defendant was guilty of second degree murder.
Defendant and a friend, John Mahoney, arrived at defendant's home to find defendant's wife (the victim) irate over her husband's late hours and drinking. Defendant was five inches taller than the victim and outweighed her by 40 pounds. According to Mahoney, the state's principal witness at trial, the victim backed the defendant into the kitchen, swung at him and grabbed him by the hair and chest. Defendant grabbed the victim and they struggled back and forth, "fussing and fighting." Mahoney turned to leave, but turned back when he heard something hitting the floor. At that point, he saw the victim on the floor with the defendant on top of her and further observed the victim's head hit the floor "maybe twice." Asked by the prosecutor whether "it could have been more than twice ...," Mahoney replied, "it might have, but I don't believe so." The victim was still grasping defendant and "[h]e had his hands on her, yes, hitting the floor."
Mahoney testified that he removed the defendant from the victim. Leaving the victim on the floor, they moved to the living room. After Mahoney left the house, defendant carried the victim to their bedroom and slept on the couch. Defendant testified that he did not discover that the victim was dead until 4:20 A.M. after receiving a phone call informing him that his company had been placed on alert.
Defendant testified at trial that he killed his wife accidentally after she had backed him into the kitchen. Defendant denied striking his wife at any time and testified that he was trying to push her away when they fell heavily to the floor with the victim on her back and defendant on top of her. He further testified that he climbed to his feet of his own accord and sat with Mahoney in the living room. Defendant stated on cross-examination that all of the victim's injuries mentioned during the experts' testimony were sustained in the one fall to the floor.
Defendant's testimony that he did not strike his wife at any time and that the killing was accidental was contradicted by numerous witnesses. Defendant's aunt testified that defendant stated that he hit the victim "with his fist." Defendant's father testified that the defendant informed *139 him that "I think I did it ... I think I hit her head on the floor."
The first officers on the scene noticed bruises on the victim's arms and chest near the collar bone. Dr. S.J. Jones, the parish coroner who examined the victim before she was removed from her home, testified that "the patient had multiple points of trauma, in many places; contusions about the ... face ... and also on the arms ... there were marks on the back of the neck which appeared to be ... marks that would be compatible with finger marks on the neck." On cross-examination, Dr. Jones testified that there were "many injuries" to the victim's head which "wouldn't have occurred in a single fall to the floor ... there are many bruises, many violent bruises and injuries to this headall about the head." Dr. Jones further testified that the cause of death "was either one or two things ... either one was sufficient ... manual strangulation or trauma, generalized, multiple points of trauma to the head."
Dr. Larue Stephens, who performed the autopsy of the victim's body, testified that, in addition to the bruises on both arms, the victim suffered "a significant amount of recent hemorrhage" over the anterior surface of the victim's left eye which was "swollen shut," which indicated "some fairly recent trauma." Upon opening the victim's skull, Dr. Stephens found significant swelling in both hemispheres of the brain and a "rather recent large fracture" in the sphenoid bone at the base of the skull. Dr. Stephens testified that a "significant force" is required to result in a fracture of the sphenoid bone. The victim further had hemorrhages in the subcutaneous tissues of the neck and a small zone of hemorrhage adjacent to the hyoid bone located within the neck. Although this bone was not fractured, there was evidence of "compression of the neck which ... indicated she had in one way or the other manual strangulation." Dr. Stephens concluded that the cause of the victim's death was "directly related to the extensive trauma to the head with the skull fracture ... directly contributing to her death was the evidence of manual strangulation." On cross-examination, Dr. Stephens reiterated that the final diagnosis included "probable recent manualdefinite strangulation...." On re-direct, Dr. Stephens testified that "there was definite evidence of some degree of strangulation."
Dr. Tom D. Norman testified for the defense, having examined the autopsy report prepared by Dr. Stephens. He testified that the victim's head injuries could have been caused from falling to the floor with the weight of the defendant upon her. However, he stated that the "possibility is less that [the arm injuries] would also have resulted from such a fall." Dr. Norman further testified that he did not "see any evidence that [the victim] was strangled." He also testified that he never saw the victim's body, never examined any microscopic slides taken from the victim's neck, never discussed the autopsy report with Dr. Stephens, and never saw or requested photographs made at the autopsy.
The majority's finding, that there is no evidence of any cause of death other than the skull fracture, is inconsistent with the foregoing testimony. Also, the majority's use of the prosecution's statement during closing argument that the defendant was guilty of manslaughter is taken out of context. The prosecutor did state in closing argument that "the State would submit that the evidence that has been adduced from this witness stand should prove to you beyond any doubt that he has committed manslaughter." My review of the trial transcript indicates that the prosecution intended by this statement that, at the very least, the defendant was guilty of manslaughter as a lesser included responsive verdict of second degree murder. The State was not conceding that the evidence supported only a manslaughter conviction.
Second degree murder is defined as "the killing of a human being ... when the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1. Based on the foregoing testimony, the jury could reasonably have found not only that the defendant deliberately struck his wife intending to cause great bodily harm, but also that defendant's use of retaliatory *140 force was completely disproportionate to the degree of provocation by the victim.
The jury was adequately instructed. Their finding was supported by the evidence. I simply cannot find from the record that a rational jury viewing the evidence in the light most favorable to the prosecution could not have found a less than preponderant showing of sufficient mitigatory factorssudden passion, heat of blood and a provocation proportionate to the manner in which this defendant retaliated.
NOTES
[1] LSA-R.S. 14:31 provides, in pertinent part, that:

"Manslaughter is: (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed."
[2] A Byrd remedy is also appropriate on application for postconviction relief. State ex rel. Burnham v. Blackburn, 484 So.2d 656 (La.1986).