626 So.2d 459 (1993)
STATE of Louisiana, Plaintiff-Appellee,
v.
Michael HOWARD, Defendant-Appellant.
No. CR93-426.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1993.
*460 James M. Buck, Monique Yvette Metoyer, for State.
Katharine Geary, for Michael Howard.
Before YELVERTON, KNOLL and THIBODEAUX, JJ.
THIBODEAUX, Judge.
On May 14, 1992, Michael Howard was indicted by the Rapides Parish grand jury for second degree murder, a violation of LSA-R.S. 14:30.1. Following a jury trial, a *461 unanimous verdict of guilty of second degree murder was returned on January 22, 1993. On January 28, 1993, the defendant received the mandatory sentence of life at hard labor without benefit of parole, probation or suspension of sentence.
He appeals and alleges nine assignments of error. We find none to have any merit and affirm defendant's conviction and sentence with instructions. We remand to the district court for the purpose of giving the defendant credit for the time he served prior to execution of his sentence.

FACTS
On or about March 21, 1992, the defendant got into an argument with Glenda Nevills, his girlfriend, the victim. The two were at the house of Nevills where they lived along with Nevills's six children. Five of the six children and the victim's ex-sister-in-law, Annie McGinnis, were present at the house when the argument escalated. The victim ran out one door of the house into the yard and around the house, followed by the defendant. She reentered at the front door. She attempted to lock the defendant out of the house, but failed.
After the defendant reentered the house, the victim retreated to the kitchen and got a knife. At this point, Ms. McGinnis left. The defendant followed the victim, challenged her to stab him and pulled open his shirt to give her a target. Testimony conflicts as to whether or not the victim actually did swipe at defendant with the knife. The defendant maintains that she did. Other witnesses testified that she dropped the knife and picked up a water jug and threw it at the defendant, striking him.
The defendant then went to retrieve a Pulaski ax from a room approximately forty to fifty-five feet away. When he returned, he struck the victim the first time as she was standing in the kitchen and knocked her to the floor. The coroner explained that there were at least four different areas on the victim's body where one or more blows occurred with the ax blade of the weapon. The wound over the left eye in his opinion was the result of two to three individual blows. The coroner explained that any one of the head wounds, except possibly the uppermost one, would have been sufficient to cause her death very quickly after the blow.

ASSIGNMENTS OF ERROR NOS. 1, 7 and 9:
The defendant alleged that the trial court erred in allowing the state to introduce gruesome photographs of the victim's face, "S-8" and "S-9," and in allowing the state to introduce into evidence "S-33," the shirt worn by witness Wayne Phillips on the night of the incident, when their probative value was far outweighed by their prejudicial nature. The defendant based his argument on La.C.E. art. 403, which allows the exclusion of relevant evidence whose probative value is outweighed by its prejudicial nature. The defendant argued that the photographs had "little relevance" and "little probative" value and were so gruesome "as to lead a juror to convict a defendant without sufficient other evidence and to cause the jurors' reasons to be overwhelmed." Likewise the defendant claimed that the witness' shirt had little, if any, probative value.
By his ninth assignment of error, the defendant alleged that the verdict of second degree murder was inappropriate because sudden passion and heat of blood were established by the evidence. The defendant argued that the testimony of the eyewitnesses established by a preponderance of the evidence the existence of sudden passion or heat of blood sufficient to deprive an average person of his self-control and cool reflection.
The defendant was convicted of second degree murder, having been found to have killed the victim when he had the specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1(A)(1). This court in State v. Campbell, 562 So.2d 37 (La.App. 3d Cir.), writ denied, 567 So.2d 101 (La.1990), held that:
The law is well settled in Louisiana that "sudden passion" and "heat of blood" are not elements of second degree murder and the State does not have the burden of proving or disproving them. The jury is instead free to infer these mitigating circumstances from the evidence. See State *462 v. Chelette, 453 So.2d 1282 (La.App. 3 Cir. 1984), writ denied, 458 So.2d 127 (La.1984); State v. Peterson, 290 So.2d 307 (La.1974); State v. White, 544 So.2d 620 (La.App. 3 Cir.1989). Id. at 38-39.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore the appellate court should not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, supra, citing State v. Richardson, 425 So.2d 1228 (La.1983).
In order for the state to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. A conviction of second degree murder must be vacated when a rational trier of fact, viewing the evidence in the light most favorable to the prosecution could only have found the defendant guilty of manslaughter. State ex rel. Lawrence v. Smith, 571 So.2d 133 (La.1990).
The state presented ample evidence upon which the jury could base its verdict. Ms. McGinnis and the victim's daughters testified that they saw the victim and the defendant arguing. The younger daughter said that the argument was over the fact that the defendant wanted money and the victim had spent it. Ms. McGinnis testified that the victim had received a check that day. Ms. McGinnis thought the check was for child support. The victim had cashed the check earlier and bought groceries. During the argument, they saw the victim run out the house, followed by the defendant. The victim reentered the house through the front door. Ms. McGinnis testified that the victim told her that she did not know what was wrong with the defendant and that someone was going to die that night.
The daughters saw the victim go to the kitchen and get a knife and saw the defendant follow her to the kitchen. At this time, Ms. McGinnis left the house. The daughters saw the victim drop the knife and throw a water jug at the defendant and hit him. They saw the defendant leave the kitchen while the victim remained. The daughters saw the defendant return with a Pulaski ax and strike the victim with it multiple times. Neither of the two saw the victim touch the defendant with the kitchen knife.
In explaining his autopsy findings, the coroner stated that he found four wound complexes. One approximately one inch long and paralleling the hairline could not be seen well in the photographs. It caused a skull fracture. The wound over the left eye was thought to be the result of two or three parallel wounds falling between the bridge of her nose and the lateral part of her eye. This group of wounds was approximately three inches long and approximately four inches deep. The lower face had two wounds. The one involving the nose and upper lip was three to four inches long. The wound from the cheekbone to the right side of her chin was six to seven inches long. The coroner stated that the wounds were consistent with the kind made by the vertical blade which parallels the handle of the Pulaski ax.
The defendant claimed that the victim had been smoking crack and drinking wine earlier at which time an argument ensued over a check she had received. The defendant admitted on cross-examination that the check belonged to the victim and that he had "no business in the check because it was hers." The defendant claimed that he merely asked about the check and the victim began cursing, starting the fight. The defendant testified that he left the house at this point, returning at approximately 8:00 or 9:00 p.m. that evening. Ms. McGinnis however, testified that she had not seen the victim buy wine or drugs that day and that she did not see the victim exhibit any signs of drug use that day.
*463 The defendant testified that when he arrived at the house that evening, the victim was in the back yard playing with the children, which was unusual at this time of night. He said that when the victim came inside she turned the stereo volume loud and began prancing around the room cursing. He said she was acting "wild." The defendant said at this point he put his hand over her mouth until she stopped cursing and that she began to struggle wildly against him at this point. He claimed to have held her for approximately five seconds. The defendant said that at his suggestion they went outside to talk and that he was on his way to his neighbor's to call the police when he saw the victim returning to the house through the front. He went in the side door of the house and she went to the kitchen. He said he went to the kitchen and called the victim. He did not see her and was heading for the back door when she allegedly came out and swung at him with the knife. The defendant said she kept cursing him and swinging the knife at him. He described her as "wild." The defendant claimed that the only other time that he'd seen the victim act wild was when she'd run out of crack. He said he told her to go ahead and cut him and opened his shirt at which time she allegedly "stuck [him] a little bit." The defendant claimed that it left only a puncture mark and that it did not bleed much. He said he got angry after she hit him with the knife.
He claimed at this point he left, but that the victim followed him. He alleged she walked behind him with the knife, threatening to kill him. The defendant said he went to the bedroom he shared with the victim to get the ax for protection. He claimed the victim did not follow him to the bedroom but stopped in the living room.
The defendant claims that the victim never put the knife down and that he was scared of her. The defendant stated that he returned to the kitchen with the ax, but did not remember anything else until the victim was lying on the floor bleeding. On cross-examination he stated he remembered speaking to Mr. Phillips afterwards. He admitted he might have told Mr. Phillips that he'd killed the victim.
When asked on cross-examination, the defendant replied he did not remember giving a statement to Detectives Terry and McCall on March 21, 1992. He also denied any memory of telling the officers he had first hit the victim on the side of the head at which point she fell. When asked on cross-examination, the defendant could not say if the victim ever got up to come after him again. In the statement, the defendant admitted having hit the victim several times, but never mentioned being scared. The defendant blamed his lack of memory on his intoxication the night of the incident.
The jurors' decision to accept the testimony of the state's witnesses was not irrational and viewing the evidence in the light most favorable to the prosecution, the jury's verdict is well supported by the evidence. The evidence was sufficient to support more than a mere finding of manslaughter. See State ex rel. Lawrence v. Smith, supra.
The photographs were introduced into evidence as "S-8" and "S-9" over the defendant's objection. In State v. Perry, 502 So.2d 543 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987), the court held that it would not find photographic evidence was admitted in error unless the photographs were so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. The photographs, though gruesome, were clearly relevant, and corroborated the state's witnesses' testimony as to how the victim died, the type and seriousness of the wounds and the fact that the coroner indeed autopsied this victim's corpse. The coroner had not received a birth certificate with the corpse. The corpse had been identified to him as that of a Glenda Deville, and not Glenda Nevills. The coroner was able to testify in court that the corpse he autopsied was that of the victim in the photographs.
Mr. Phillips' shirt was introduced as "S-33" over the defendant's objection. In State v. Deaton, 412 So.2d 586, 588 (La.1982), the court held:
In considering whether demonstrative evidence is admissible over an objection that it is unduly inflammatory, the test to *464 be applied is whether the proffered evidence is relevant to any material issue in dispute and, if so, whether its probative value exceeds its probative prejudicial effect. State v. Manieri, 378 So.2d 931 (La. 1980); State v. Hawthorne, 345 So.2d 1170 (La.1977).
The condition of the shirt corroborates the testimony given by him. The witness had heard screaming coming from the house across the street when he was leaving his house. He paused for a while when he saw the defendant exiting the house with an ax, walking towards him. The defendant appeared upset. The witness offered assistance but refused to return to defendant's house with him. At this point, the defendant began to get emotional, grabbing hold of the witness, placing his head on the witness' shoulder and holding onto him around the arms and chest while still holding the ax. The shirt stains support this testimony.
The trial court did not err in finding that the photographs and the shirt were relevant. The fact that more than sufficient evidence existed to prove the defendant killed the victim while possessing either the intent to kill or to inflict great bodily harm, supports a finding that the admission of this evidence did not lead to the defendant being convicted without sufficient evidence. There was no manifest error on the part of the trial judge in allowing the evidence to be admitted. The court's decision was within its discretion. Likewise, the jury was well within its discretion to believe the testimony of the victim's two daughters and her sister-in-law over that of defendant as to the nature of the argument. Therefore, it made a proper finding that a preponderance of the evidence did not establish the killing was provoked by a sudden passion or heat of blood immediately sufficient to deprive an average person of his self-control and cool reflection. LSA-R.S. 14:31. Therefore, its verdict of guilty of second degree murder was not due to the overwhelming nature of the photographs or the witness' shirt, nor was it based on insufficient evidence. Therefore, the trial court committed no error in admitting them into evidence.

ASSIGNMENTS OF ERROR NOS. 2 and 5:
The defendant alleged that the trial court erred in allowing Officer Delcomyn to testify as an expert in the field of crime scene investigation and interpretation of blood spatters and in allowing Dawn Tingle to testify as an expert in the field of serology.
La. C.E. art. 702, which addresses the testimony of experts, provides that:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Comment (d) states that broad discretion should be accorded the trial judge in his determination as to whether expert testimony should be admissible and who should or should not be permitted to testify as an expert. The competence of an expert witness is within the sound discretion of the trial judge, and his rulings will not be disturbed on review in the absence of manifest error. State v. Parker, 596 So.2d 315 (La. App. 3d Cir.1992).
Officer Ray Keith Delcomyn was employed by the Alexandria Police Department and had worked in the area of blood spatter identification and interpretation since 1975 when he began his training in this area at the police academy. Since then, he has attended several courses which have addressed blood spatter identification and interpretation and one which dealt exclusively with the subject. The officer has been a lecturer on the subject since 1988. He has lectured at several training institutes including that of the U.S. Marshall's Special Service Operations Group in 1992. He has worked as a consultant in this field, and has assisted the law enforcement agencies of several other cities and parishes. Prior to the present trial, this witness had been qualified as an expert witness in this field in this same judicial district in 1986.
It is not required that the person giving an expert opinion be the foremost expert in the field; rather, the test of the competency of an expert is the sufficiency of *465 his knowledge of the subject about which he is called to express an opinion. State v. Honeyman, 565 So.2d 961 (La.App.2d Cir. 1990). Officer Delcomyn's training and experience sufficiently qualify him to express an opinion regarding blood spatter analysis. Blood spatter analysis was recognized as a relatively new branch of criminalistics in State v. Williams, 445 So.2d 1171 (La.1984).
The state also called Dawn Tingle, a serologist with the North Louisiana Crime Laboratory. She had been employed there for two and one half years and performed thousands of tests in that time. She testified there is no certification for serologists. Ms. Tingle obtained a degree of bachelor of science in biology from Milsaps College and spent approximately a year at the crime lab receiving formal training. She has also attended week long seminars on serology. At the end of her year of training, she was allowed to perform testing unassisted. Ms. Tingle also testified that she had been qualified as an expert in the field of serology in approximately ten cases in several different parishes.
Both Officer Delcomyn and Ms. Tingle possessed sufficient training, education and experience to qualify as an expert in their respective fields. Accordingly, it cannot be said that the trial court committed a manifest error when it found that Officer Delcomyn and Ms. Tingle were each qualified to give expert testimony in their respective fields.

ASSIGNMENT OF ERROR NO. 3:
The defendant alleged that the trial court erred in permitting Officer Delcomyn to testify as to what he believed to be the actions of the individuals involved, and permitted him to testify without stating it was his opinion. In particular, the defendant complains of the testimony by the officer regarding what the blood spatters indicated, when he stated:
Basically, sir, that particular spatter, uh, indicated that Ms. Nevills was standing approximately two feet to the side of the table. At some point, an injury occurred to her and, in her falling backwards in this direction, in other words ...
Although no objection was made immediately following the question which prompted this answer or after the answer itself, an objection was raised after the answer to the question. The objection was made off the record, but the judge, in ruling on the record stated, "Your objection to the form of the question is noted and overruled." Later, the reasons for the objection were stated out of the presence of the jury. The defense stated an objection to any testimony beyond what the angle and direction of the blood spatter were. Specifically objected to was testimony characterized as "conclusion" testimony, referring to the officer's testimony that certain blood spatters indicated that the victim was falling down or falling backward at the time.
The testimony was not improper and did not mislead the jury. The state clearly set out Officer Delcomyn's testimony on this subject as the opinion of an expert in this field. La. C.E. art. 702 allows experts to give opinions. The jury instructions clearly explained to the jury how such testimony was to be treated, concluding the instruction as follows:
If an expert opinion is based on fact and sound reason, you should give it proper credit and due weight. However, if you find that an expert's opinion and conclusions are not based on established facts and sound reason, you may give his opinion less weight or disregard his opinion entirely.
Additionally, it should be noted that the defense had ample chance during its cross-examination of this witness to emphasize the opinion nature of this testimony and to clearly indicate any weaknesses therein.

ASSIGNMENTS OF ERROR NOS. 4 and 8:
In his fourth assignment of error, the defendant alleged that the trial court erred in admitting the state's evidence offering of "S-15" as the shirt the defendant was wearing. By his eighth assignment of error, he alleged the trial court erred in allowing Wayne Phillips to testify as to what the victim's children told him about the crime. However, neither of these assignments of error were briefed.
*466 Failure to argue an assignment of error constitutes a waiver of that error. State v. Lewis, 576 So.2d 1106 (La.App. 3d Cir.), writ denied, 580 So.2d 669 (La.1991). See also Uniform RulesCourts of Appeal, Rule 2-12.4. Therefore, the defendant's assignments are deemed abandoned.

ASSIGNMENT OF ERROR NO. 6:
The defendant alleged that the trial court erred in allowing the jury to have a transcript of the taped statement of the defendant which was played in open court. The defendant contended that the transcripts served only to reinforce the statement, giving it more weight and clarifying it "more than any of the other evidence presented." The defendant alleged that La.C.Cr.P. art. 793 prohibits such reference to notes or written evidence.
The court in State v. Snedecor, 294 So.2d 207 (La.1974), held that a transcript of a tape was admissible over a best evidence objection, since the transcript provided the jury with a convenience in following the playback of the tape. See also State v. Barbre, 499 So.2d 1324 (La.App. 3d Cir.1986). In the present case, the transcript provided the same convenience to the jury. However, the defendant's complaint was of undue emphasis. It should be noted that there was no indication that the tape and transcript contained inaccuracies. Therefore it cannot be said that the jury was being misled. The jury was free to give appropriate weight to the statement.
La.C.Cr.P. art. 793 addresses the use of evidence in the jury room. It provides that:
A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
In State v. Perkins, 423 So.2d 1103 (La. 1982) the court, citing State v. Freetime, 303 So.2d 487 (La.1974), stated:
In State v. Freetime, supra, this court found reversible error when the trial court permitted the jury to read the defendant's confession after retiring to deliberate. The written statement in this case, although not a confession, is an inculpatory statement made by the defendant, and the same danger which was present in Freetime is present in this case. This danger is that undue weight may be given to this particular piece of evidence. The legislature designed article 793 to prevent this precise danger. This legislative directive has not been amended, nor has Freetime been overruled: this court is bound to find that the sending of this written statement to the jury deliberation room is reversible error.
The defendant would have this court extend this rule to prohibit the jury from viewing such evidence during the trial. We decline that invitation.
The state's request was based on the poor quality of the tape. The judge listened to a portion of the tape to confirm the tape quality prior to allowing the jury to view the transcript or hear the tape. It was also noted that in deleting portions of the tape pursuant to the defense's motion in limine, a portion of the tape referring to allegations of another witness and his possible crack use, was accidentally erased. This was not deleted from the transcript. Thus, at this point it could be said that the transcript was the best evidence. The state requested that the jury be allowed to read this portion of the transcript as well, with an explanation of the deletion from the tape.
In ruling on the defendant's objection, the court stated that in light of the fact that this was not live testimony and the jury did not have the benefit of observing the person speaking, including reading the person's lips, he was going to allow the transcript within certain restrictions. The jurors were not to be allowed to retain the transcript afterwards and were to be instructed only to follow along with the tape, not to read ahead or reread any portion. The jury was so instructed. The tape was turned off and the jury allowed to read the two sentences accidentally *467 deleted. After the tape was played, the transcripts were collected.
The jury's viewing of the transcript in this case does not fall under the ban set out in La.C.Cr.P. art. 793 as the transcript was not allowed in the jury room. Further, in light of the circumstances and the manner in which the transcript viewing was handled, no undue emphasis was placed on this statement. The trial court did not err and there is no merit in the defendant's assignment of error.

ERRORS PATENT
La.C.Cr.P. art. 930.8 provides that at the time of sentencing the trial court shall inform the defendant of the prescriptive period for post-conviction relief. The record shows the court did not so inform the defendant. This defect has no bearing on whether the sentence is excessive and thus is not grounds to reverse the sentence or remand the case for resentencing. La.C.Cr.P. art. 921.
The district court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3d Cir.1993).
La.C.Cr.P. art. 880 provides that when imposing sentence, the court shall give the defendant credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence. The record indicates the trial court did not do so. The defendant's sentence is therefore amended to reflect that the defendant is given credit for time served prior to the execution of the sentence. See La.C.Cr.P. art. 882(A). Resentencing is not required. However, we are remanding this case and directing the district court to amend the commitment and minute entry of the sentence to reflect that the defendant is given credit for time served.

CONCLUSION
The defendant's conviction for second degree murder is affirmed and his sentence is amended and affirmed, as amended. We remand to the district court for proceedings consistent with this opinion.
AFFIRMED AND REMANDED WITH INSTRUCTIONS.