NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

07-702

STATE OF LOUISIANA

VERSUS

TERRELL P. BARKER

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 06-K-0010-A
HONORABLE JAMES P. DOHERTY, JR., DISTRICT JUDGE

**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of Michael G. Sullivan, Glenn B. Gremillion, and Billy H. Ezell, Judges.

AFFIRMED; REMANDED WITH
INSTRUCTIONS, AS AMENDED.

Earl B. Taylor
District Attorney, 27th J.D.C.
Alisa Ardoin Gothreaux
Asst. District Attorney
P. O. Drawer 1968
Opelousas, LA 70571-1968
(337) 948-0551
Counsel for Plaintiff/Appellee:
    State of Louisiana

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P. O. Box 2775**
**Monroe, LA 71207-2775**
**(318) 387-6124**
**Counsel for Defendant/Appellant:**
     **Terrell P. Barker**

GREMILLION, Judge.

In this case, the defendant, Terrell Barker, was convicted by a jury of second degree murder, a violation of La.R.S. 14:30.1, and was subsequently sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He is now before this court on appeal claiming that the evidence was insufficient to convict him of second degree murder. For the following reasons, we affirm.

## SUFFICIENCY OF EVIDENCE

In his sole assignment of error, Defendant argues that the evidence presented at trial was not sufficient to convict him of second degree murder. More specifically, he maintains that he was acting in self-defense when he fired the fatal shots which caused the Victim's death. Further, he contends that if the jury did not find sufficient evidence to acquit him on his self-defense argument, then at most, his actions rose to the level of manslaughter.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has

satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The elements of second degree murder are set forth in La.R.S. 14:30.1(A), which reads in pertinent part, "Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm."

The record is replete with evidence that shows that the State satisfied its burden of proving the elements of the crime of second degree murder. It is clear that Defendant shot the Victim, Anthony "Tony" Freeman, three times on January 1, 2006, and that the Victim died during surgery at Opelousas General Hospital as result of his gunshot wounds.

Charles Eaglin, the Victim's uncle by marriage, testified that the Victim was at his house, located at 1058 Harper Street, for approximately four hours on New Years Day, 2006. His house, the last house on a dead end street, was the location of the shooting. Charles stated that both he and the Victim had been drinking that day, but he did not consider himself to be intoxicated. He added that the Victim left his house for about fifteen minutes to purchase beer and returned with James Roberts and Chad Small. They all got out of the car and were sitting with Charles on the back of his son's car which was parked on the left-hand side of the street directly in front of his house.

About forty-five minutes to an hour later, Defendant drove up and stopped about two car lengths behind the Victim's car, which was also parked directly in front of Robert's house on the left-hand side of the street facing the dead end. At

2

that time, Charles, his son, Shuream, and Roberts were standing along the back of his car and listening to music playing in the Victim's car.  According to Charles, it was not dark at that time.  He testified that he could not recall if the Victim was inside of his car at the time Defendant drove up, but was certain that he was changing the music in his car before Defendant arrived.

Charles said that Defendant got out of his car and the Victim started walking toward him.  He testified that the Victim had nothing in his hands and was not speaking in a loud voice when he asked Defendant something like, "What's up" or "What's going on, man?"  Charles estimated that he was about thirty feet away from the Victim when Defendant came out from behind his car door.  The Victim was about five feet from Defendant at that time, and Charles could see a large black gun in Defendant's right hand.  According to Charles, the Victim raised up his hands and said, "Whoa," as though he was shocked.  Charles testified next that Defendant responded something like, "We don't play this f _ _king s _ _ t," or "I told you we don't play this f _ _ king s _ _ t," and shot the Victim, causing him to fall toward Defendant.

Initially, Charles testified that Defendant shot the Victim two more times before he fell on Defendant, however, he later stated that he was not sure if the Victim fell on Defendant after the first shot or after he had been shot several times.  Next, according to Charles, Small grabbed Defendant's arm with the gun causing Defendant to move and, at that time, the Victim fell to ground.  Charles maintained that there was no scuffle before the first shot was fired and that the Victim did not try to take the gun from Defendant.  Charles stated that he heard three or four shots.

3

Charles explained that he was surprised at the shooting because the two men were friends. He did not see the Victim do anything prior to the shooting which would have frightened Defendant, or threaten Defendant in any way.

Shuream testified that he was at his father's house on January 1, 2006. He stated that he woke up that afternoon around 2:30 p.m. and that the Victim was there at that time. According to Shuream, the Victim stayed at the house until he left to go to the store at about 3:00 to 3:30 p.m. Eventually, Shuream went outside to join the Victim, his father, Roberts, and Small who were all in front the house sitting on his younger brother's car that was across the street. Shuream testified that the Victim's car was parked on the opposite side of the street, the same side as his parent's house.

It was still daylight and the men were all drinking and listening to music playing in the Victim's vehicle. Shuream estimated the time to be about 4:00 p.m. and said that he had drunk two to three beers up to that time. He stated that he saw a vehicle pull up and stop in front of Roberts' house, which he explained is located before his parents' house on the same side of the street. The vehicle stopped on the same side of the street as the Victim's car. Defendant got out of the vehicle and when he stepped away from his car, Shuream could see him holding a black pistol that looked like a nine-millimeter automatic. He estimated that he was roughly thirty feet away from where Defendant was standing.

Shuream testified that he was not alarmed and did not expect anything to happen upon seeing the pistol other than the possibility that Defendant would fire it into the air in celebration of the New Year. He claimed that he was unaware of any

4

animosity between the Victim and Defendant. Shuream explained that at the time Defendant got out of the car, the Victim was reaching into the front passenger side of his car for some reason and did not appear to notice that Defendant had pulled up. Shuream said that when the Victim noticed Defendant, he placed his drink on the car while the music continued to play, started walking toward Defendant, and said something like, "Hey, man." Shuream said that he did not see the Victim take anything from his vehicle and put it on his person, nor had he ever seen the Victim with a firearm in his vehicle. Shuream stated that the Victim had nothing in his hands.

Shuream believed that the pistol was visible to the Victim, but did not think that he noticed it. He estimated that the Victim was about five feet away from Defendant before anything happened. He said that the Victim did not display any aggression toward Defendant, nor did he see him do anything with his hands. The first words that Shuream heard Defendant say were, "I'm going to show y'all mother f - - kers how I get down."

When the Victim and Defendant were about three feet from each other, Shuream heard the first gunshot. According to Shuream, the Victim prevented Defendant from raising the gun, which was in his left hand and it did not come all the way up; thus, the shots were fired toward the Victim's mid-section. On cross-examination, Shuream stated that the gun was in Defendant's left hand when he got out of his vehicle and that he switched it to his right hand at some point. Additionally, he stated that the Victim used his left hand when he tried to stop Defendant from raising the gun. Shuream testified that after the first gunshot, the

5

Victim's left hand fell to Defendant's shoulder, and he was leaning on Defendant. The Victim fell onto Defendant and then additional shots were fired. Shuream said the Victim was holding Defendant while all three shots were fired.

Shuream testified that the Victim was fighting for his life while all three shots were fired. After the shots were fired, the two men separated and the Victim fell face first. Shuream stated that Roberts, not Small, came from behind the two and was the primary one to separate them.

Roberts testified that he was living next door to the Eaglins at the time of the shooting, and that he knew Defendant about six years prior to that time. He also knew the Victim and was a close friend to him as well as to his family.

On the day of the crime, Roberts first saw the Victim that afternoon a couple of blocks from his home. Roberts met him at a store and caught a ride with him back to his house. While at the store and sitting inside the car with Small, Roberts saw the Victim speaking with Defendant outside of the store. According to Roberts, it may have been around 3:00 to 3:30 p.m. Roberts could not hear what was said, but it appeared that they were arguing based on their movements. Although he knew the men to be friends, he had seen them argue before. However, he did not see anything at the store that would indicate that there was such animosity between the men that a shooting would ensue.

Roberts stated that at the time of the shooting he had consumed about two six packs. Nonetheless, he was confident in telling the jury that he was sober enough to properly testify as to what he observed. When Defendant arrived on the scene, it was about 4:45 p.m., and Roberts was sitting on a parked vehicle on the left-

6

hand side of the street, which was facing the dead end. He said that the Victim's car was also facing the dead end. Roberts stated that Defendant pulled up in front of his house approximately fifteen feet from the Victim's car. The Victim was at his car turning on some music or adjusting the music when Defendant pulled up. Roberts testified that the Victim immediately stood up and walked toward Defendant's car. He could not hear what the Victim said as he walked toward Defendant; however, he thought it was like they had a misunderstanding and the Victim went to Defendant's car to talk to him.

As he approached the Victim, Roberts claimed that Defendant initially hid the gun, but a black pistol appeared as he came closer to him. Roberts was not close by and was talking with other people, but he testified that he heard Defendant say something like, "I don't play this f _ _ king s _ _ t." Roberts also explained that the incident happened very fast and that he did not know, nor was he expecting, that the shooting was going to occur. He did not recall that the Victim ever touched Defendant before the shooting but did observe him grab Defendant on the shoulder as the gun was going off. According to Roberts, he did not see the Victim with a weapon or anything in his hands when he approached Defendant.

Roberts estimated that the Victim was about three feet away from Defendant when the first shot was fired. He said that the Victim was not touching Defendant when the first shot was fired, nor did he grab Defendant as he raised the gun. As soon as Roberts saw the gun, he started walking quickly toward them and was about three feet away when the first shot was fired. He believed that Small moved toward the men from their back side after the first shot was fired. Roberts

7

testified that he did not attempt to separate the men or to grab the gun, nor did he see the Victim fall to the ground after the shots were fired, but he did see him on the ground after the shooting.

Small testified that he was also living on Harper Street at the time of this incident. He stated that on the day of the shooting, he went to the store with the Victim, and Roberts caught a ride back with them. He said that he was friends with Defendant prior to the shooting and had known him about five to six years, whereas he had known the Victim about two years prior to the shooting.

Small stated that he saw Defendant at the store but did not hear any conversation between him and the Victim, nor did he see the two men in close proximity to one another inside or outside of the store. He observed Defendant throw up his hands and walk away, but he did not see at whom Defendant was making the gesture.

According to Small, the shooting occurred fifteen to thirty minutes after they returned to Harper Street. He stated that he had consumed a six pack of beer but denied being impaired with regard to his ability to observe what happened. He explained that he was standing in a wooded area located about ten car lengths or fifty yards away from the Victim when he saw Defendant drive up. He did not see Defendant get out of his car because he was talking with someone and was not paying attention to what was going on in the street. However, as he left the area and started moving toward the Eaglins' house, he heard three to four gunshots fired in rapid succession and began to run in the direction of the shots. When he arrived on the scene, he observed Defendant getting in his car and the Victim on the ground. Small

8

said that Charles, Shuream, and a nephew were trying to help the Victim, that Roberts was coming out of his yard toward the scene, and that Defendant was driving away from the scene. He denied ever touching Defendant or attempting to take the gun from his hand. He further denied seeing Defendant and the Victim physically touch and stated that he did not try to separate the two or grab the gun.

Dr. Collie Michael Trant, a forensic pathologist, testified that he performed an autopsy on the Victim in the Lafayette Parish Coroner's Office. Dr. Trant said that the Victim had three gunshot wounds—one to the middle chest, one in the abdomen, and the third in the left leg, and that either the wound to the chest or the abdomen caused his death. In addition to the gunshot wounds, the Victim had an incised wound on the middle part of his right hand at the base of the fifth finger, bruises on the top part of his right hand over the knuckles, and some abrasions on his knees which were consistent with a fight or scuffle. According to Dr. Trant, the wounds could also have resulted from the Victim's fall after he was shot.

Initially, Defendant contends that he was acting in self defense, and thus, the homicide was justifiable. Louisiana Revised Statutes 14:20(A)(1) states, in pertinent part, "A homicide is justifiable [w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." Additionally, as noted by this court in *State v. Latchie*, 535 So.2d 541, 543 (La.App. 3 Cir. 1988):

> [T]he defendant who asserts self-defense does not assume any burden of proof on that issue. The State has the affirmative duty of proving beyond a reasonable doubt that the homicide was not perpetuated in self-defense. *State v. Sylvester*, 438 So.2d 1277 (La.App. 3 Cir.1983),

9

writ den., 444 So.2d 606 (La.1984)*; State v. Brockington, supra* [437 So.2d 994 (La.App. 3 Cir.1983)], *State v. Pittman*, 428 So.2d 979 (La.App. 1 Cir.1983), writ den., 433 So.2d 155 (La.1983), cert. den., 464 U.S. 836, 104 S.Ct. 122, 78 L.Ed.2d 120 (1983). Thus, the State must show beyond a reasonable doubt that the defendant did not reasonably believe that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save his life.

On appeal, the relevant inquiry is whether any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense after viewing the evidence in the light most favorable to the prosecution. *State v. Sylvester*, *supra*; *State v. Brown*, 414 So.2d 726 (La.1982).

The record is clear that the Victim did not make any aggressive moves toward Defendant or threaten him in any way prior to the shooting. The witnesses also testified that the Victim did not have a weapon or anything else in his hands as he approached Defendant. Additionally, Charles testified that there was no scuffle between the men prior to the shooting. Shuream stated that he did not see Freeman do anything with his hands immediately before the shooting, and Roberts did not recall seeing the Victim touch Defendant before the gun was fired. The physical evidence, bruises on the right hand and abrasions on the Victim's knees, could have resulted from his fall to the ground following the shooting. We, therefore, find that the State met its burden of showing, beyond a reasonable doubt, that Defendant did not reasonably believe that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save his life.

Next, Defendant argues that if the jury did not find sufficient evidence to acquit him based on self-defense, then at most, the killing rose to the level of manslaughter. Manslaughter is defined in La.R.S. 14:31(A)(1) as "[a] homicide which would be murder under either Article 30 (first degree murder) or Article 30.1

10

(second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." In *State v. Hargrave*, 05-1027, pp. 3-4 (La.App. 3 Cir. 3/1/06), 926 So.2d 41, 44, *writ denied*, 06-1233 (La. 11/22/06), 942 So.2d 552, this court wrote:

> The Defendant, not the State, has the burden of proof on a defense of manslaughter. *State v. Wright*, 02-1268 (La.App. 3 Cir. 3/5/03), 839 So.2d 1112. Louisiana has followed the rule articulated in *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), requiring a defendant to prove the mitigating factors of sudden passion or heat of blood to reduce homicide to manslaughter. *State v. Smith*, 571 So.2d 133 (La.1990). A defendant who establishes by a preponderance of the evidence that the homicide was committed in sudden passion or heat of blood, the jury errs in finding the defendant guilty of second degree murder. *Smith*, 571 So.2d at 136.

First, we note that Defendant did not call any witnesses on his behalf or present any evidence to show that the shooting was committed in sudden passion or heat of blood. Further, none of the State's witnesses reflected the possibility of sudden passion or heat of blood between Defendant and the Victim. Both Charles and Shuream testified that they were surprised at the shooting. Charles testified that he believed that the two men were friends, while Shuream stated that he was unaware of any animosity between them. None of the State's witnesses heard any communication from the Victim to Defendant when the men were at the store or immediately prior to the shooting which would incite sudden passion or heat of blood. In fact, the testimony of Charles and Shuream reflects that when the Victim spoke to Defendant just prior to the shooting, he did not use a loud voice, used words of salutation acknowledging Defendant's presence, appeared shocked when he saw Defendant raise the gun at him, was unarmed, and did not appear threatening in any

11

way. Accordingly, we find that Defendant failed to establish by a preponderance of the evidence that the homicide was committed in sudden passion or heat of blood.

Finally, Defendant criticizes the reliability and credibility of the State's witnesses. First, he asserts that the testimony of the State's witnesses is not reliable because they all admitted to drinking prior to the shooting, and thus, were impaired at that time. Second, Defendant complains that all of the witnesses had some familial or other connection to the Victim. Third, he notes discrepancies in the testimony with regard to the location and positioning of the vehicles at the scene of the shooting and with regard to the person or persons who intervened after the shooting.

This is typical of almost any recounting by eyewitnesses of a crime. Rarely do all of the witnesses agree on all of what they saw or heard, particularly the minutia. As with all well-tried cases, the jury was allowed to hear the witnesses express their version of the shooting, even those which Defendant alleges diminished the reliability and credibility of the State's witnesses. With that in mind, it is the role of the jury to weigh the respective credibility and reliability of the witnesses and to accept or reject, in whole or part, the testimony of any of the State's witnesses. *State v. Kennerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367.

We find that the jury could have found that the essential elements of second degree murder were proved beyond a reasonable doubt. Thus, this assignment of error is without merit.

12

## ERRORS PATENT

We review all appeals for errors patent on the face of the record in accordance with La.Code Crim.P. art. 920. After reviewing the record, we find that there is one error patent.

At sentencing, the trial court stated that Defendant is not entitled to credit for time served. Louisiana Code of Criminal Procedure Article 880 provides, "[a] defendant shall receive credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence." However, since the trial court in this case made an affirmative statement that Defendant is not entitled to credit for time served, we are required to amend his sentence to delete this denial of credit for time served even though he received a life sentence without the benefit of parole, probation, or suspension of sentence. Accordingly, the trial court is instructed to make an entry in the minutes reflecting this change. *See State v. Dossman*, 06-449, 06-450 (La.App. 3 Cir. 9/27/06), 940 So.2d 876, *writ denied*, 06-2683 (La. 6/1/07), 957 So.2d 174.

## CONCLUSION

Defendant's conviction for second degree murder is affirmed. Further, we amend his sentence to delete the denial of credit for time served, and the trial court is instructed to make an entry in the minutes reflecting this change.

**AFFIRMED; REMANDED WITH INSTRUCTIONS, AS AMENDED.**

This opinion is NOT DESIGNATED FOR PUBLICATION, Uniform Rules—Courts of Appeal, Rule 2-16.3.