KNOLL, Judge.
The sole issue in this appeal is whether the sentencing court erred in imposing a twenty-one year sentence at hard labor on defendant, David Hill Lawrence, for the 1976 homicide of his wife, Sandra Lawrence.
PROCEDURAL HISTORY
In 1978, Lawrence was found guilty as charged of second-degree murder (LSA-R.S. 14:30.1) and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. Our Supreme Court affirmed his conviction on appeal. State v. Lawrence, 365 So.2d 1356 (La. 1978), cert. denied, 444 U.S. 846, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). In a post-conviction relief proceeding, our Supreme Court reversed Lawrence’s conviction of second-degree murder, entered a judgment of manslaughter (LSA-R.S. 14:31), and remanded the case to the district court for resentencing. State ex rel. Lawrence v. Smith, 571 So.2d 133 (La.1990). On January 21, 1991, Lawrence was sentenced to the maximum, twenty-one years at hard labor.
FACTS
The following set of facts is taken from the Supreme Court’s opinion in State ex rel. Lawrence v. Smith, supra:
“David Hill Lawrence, a career sergeant in the Army stationed at Fort Polk, Louisiana, spent the evening of August 26, 1976, drinking beer with several Army *335 friends. Lawrence called his wife between 4:30 and 5:30 P.M. to tell her he would be late getting home. Between 8:30 and 9:30 P.M. he called again to say he was on his way home. During the four hours, Lawrence consumed seven or eight beers. Sergeant John Mahoney was having car trouble and accompanied Lawrence. About 10:00 P.M. the two men arrived at the Lawrence home in Simpson, Louisiana, where they intended to spend the night. Mahoney was a good friend of the couple and had previously stayed overnight at their home.
Sandra Lawrence, David’s wife of almost seven years, was furious. After an argument, she attacked David and backed him into the kitchen. A fight ensued. Mahoney was on the verge of leaving the kitchen when he heard a body or bodies hitting the floor. He turned and saw the two struggling on the floor with David on top of Sandra hitting her head on the floor. Mahoney pulled David away from his wife and tried to calm him down. The two men left Sandra lying on the floor of the kitchen and went to the front porch for a cigarette. When Mahoney returned to check on Sandra, she was lying on the kitchen floor breathing heavily. Not realizing that Sandra was seriously hurt, Mahoney left in David’s truck. This was the only available transportation, and Mahoney intended to return for David the next morning.
David Lawrence said he spoke to his wife and carried her into the bedroom before falling asleep on the living room couch. When he received a call around 4:20 A.M. advising him that his company had been placed on alert, David went into the bedroom and discovered that his wife was dead. The caller, Donald Wayne Martin, said that David sounded like someone just waking up. After finding Sandra, David called Mahoney and asked him to notify the coroner and sheriff’s office. David also telephoned his father, J.W. Lawrence, Jr., about 4:30 A.M. and said: ‘Sandy is dead.’ (Tr. 308.) In response to his father’s questions, David said he thought he must have killed Sandra when he hit her head on the floor. Sergeant and Mrs. Lawrence had two children, a boy and a girl, and appeared to have a normal family life. David’s aunt, Joy Lynn Lawrence, saw the couple frequently and had never seen them fight or argue. They had attended a family services clinic at Port Polk because Sandra, a native of Pennsylvania, did not like Louisiana. Sandra was five feet five inches tall and weighed about 112 pounds. David was five feet ten inches tall and weighed about 155 pounds.
Aunt Joy and, a little later, David’s father, arrived at the house shortly after David’s call and confirmed that Sandra was dead. David was sobbing, and his son, Patrick, was trying to console him. Aunt Joy had never seen her nephew cry. David’s father, a retired Army Lieutenant Colonel, said that David was in a state of shock and in no condition to answer questions. Through Aunt Joy, he had advised David to remain silent. At the time of trial, Lawrence had been in the military ten years and five months. He had served two tours of duty in Vietnam and thirteen months in Korea, receiving eight awards for merit and two unit awards, including a special commendation. He had reached the rank of Sergeant E-5 and served as crew chief on a helicopter.
Lehrue Stevens, Jr., the pathologist who performed the autopsy, said Sandra Lawrence had bruises on her arms and chest, bruising at the neck consistent with strangulation, and a fracture at the base of the skull which extended three inches toward the left ear. The skull fracture resulted from a significant force but could have been caused by a fall in which two people were struggling. Dr. Stevens estimated that death occurred between 10:00 P.M, and midnight.
Pathologist Tom Norman, another expert witness, found no evidence of strangulation and attributed death to the severe skull fracture. Dr. Norman said the fracture could have resulted from a violent fall. According to Dr. Norman, Sandra Lawrence would have been tempo *336 rarily unconscious but might have regained her senses for a short interval preceding her death. Dr. S.J. Jones, the coroner who examined the body at the scene, testified about the severe massive injury to the head. His estimate of the time of death was between 9:45 and 10:00 P.M.”
In the dissent, Chief Justice Calogero expounded on the forensic evidence:
“The first officers on the scene noticed bruises on the victim’s arm and chest near the collar bone. Dr. S.J. Jones, the parish coroner who examined the victim before she was removed from her home, testified that ‘the patient had multiple points of trauma, in many places; contusions about the ... face ... and also on the arms ... there were marks on the back of the neck which appeared to be ... marks that would be compatible with finger marks on the neck.’ On cross-examination, Dr. Jones testified that there were ‘many injuries’ to the victim’s head which ‘wouldn’t have occurred in a single fall to the floor ... there are many bruises, many violent bruises and injuries to this head — all about the head.’ Dr. Jones further testified that the cause of death ‘was either one or two things ... either one was sufficient ... manual strangulation or trauma, generalized, multiple points of trauma to the head.’ Dr. Larue Stephens, who performed the autopsy of the victim’s body, testified that, in addition to the bruises on both arms, the victim suffered ‘a significant amount of recent hemorrhage’ over the anterior surface of the victim’s left eye which was ‘swollen shut,’ which indicated ‘some fairly recent trauma.’ Upon opening the victim’s skull, Dr. Stephens found significant swelling in both hemispheres of the brain and a ‘rather recent large fracture’ in the sphenoid bones at the base of the skull. Dr. Stephens testified that a ‘significant force’ is required to result in a fracture of the sphenoid bone. The victim further had hemorrhages in the subcutaneous tissues of the neck and a small zone of hemorrhage adjacent to the hyoid bone located within the neck. Although this bone was not fractured, there was evidence of ‘compression of the neck which ... indicated she had in one way or the other manual strangulation.’ Dr. Stephens concluded that the cause of the victim’s death was ‘directly related to the extensive trauma to the head with the skull fracture ... directly contributing to her death was the evidence of manual strangulation.’ On cross-examination, Dr. Stephens reiterated that the final diagnosis included ‘probable recent manual — definite stran-gulation_’ On re-direct, Dr. Stephens testified that ‘there was definite evidence of some degree of strangulation.’
Dr. Tom D. Norman testified for the defense, having examined the autopsy report prepared by Dr. Stephens. He testified that the victim’s head injuries could have been caused from falling to the floor with the weight of the defendant upon her. However, he stated that the ‘possibility is less that [the arm injuries] would also have resulted from such a fall.’ Dr. Norman further testified that he did not ‘see any evidence that [the victim] was strangled.’ He also testified that he never saw the victim’s body, never examined any microscopic slides taken from the victim’s neck, never discussed the autopsy report with Dr. Stephens, and never saw or requested photographs made at the autopsy”.
SENTENCE REVIEW
Article 1, Section 20 of the Louisiana Constitution prohibits the imposition of an excessive sentence. For a sentence to be excessive, the penalty must be so disproportionate to the crime committed, in light of the harm caused to society, as to shock our sense of justice, or where the sentence makes no measurable contribution to the acceptable goals of punishment and involves nothing more than the needless and purposeless imposition of pain and suffering. State v. Campbell, 404 So.2d 1205 (La.1981); State v. Freeman, 444 So.2d 243 (La.App. 1st Cir.1983), writ denied, 447 So.2d 1076 (La.1984).
The sentencing court is given wide discretion in imposing a sentence within the *337 statutory limits. State v. Square, 433 So.2d 104 (La.1983). A séntence within the statutory limits should not be set aside as excessive in the absence of a manifest abuse of the sentencing court’s discretion. State v. Abercrumbia, 412 So.2d 1027 (La. 1982).
In its reasons for sentence, the sentencing court characterized the gravity of this offense as “the obvious harm caused by the defendant’s conduct in this case is just about as harmful and just about as permanent as the mind of man can imagine.” The sentencing court also observed, as does this court, that there is no excuse for defendant’s conduct. Defendant, who outweighed his wife by forty-three pounds and was five inches taller, was a soldier trained in hand to hand combat and is a combat veteran of the Vietnam War. Although defendant’s wife initiated the argument, defendant’s response — tackling his wife and slamming her head against the floor several times — far exceeded the force necessary to thwart her advance.
The maximum sentences are reserved for the most serious violators of the offense charged. State v. Guajardo, 428 So.2d 468 (La.1983). In State v. Hampton, 482 So.2d 141 (La.App. 4 Cir.1986), writ denied, 486 So.2d 749 (La.1986), defendant’s sentence of 21 years at hard labor for manslaughter was upheld where defendant fatally bludgeoned a 65 year old man with a crowbar over five dollars. Our brethren of the Fourth Circuit agreed with the sentencing court that the brutal nature of the crime warranted the maximum sentence.
Likewise, in a similar domestic violence case, this court upheld a sentence of 21 years at hard labor for manslaughter where defendant fatally shot his wife after an argument. State v. Grow, 467 So.2d 159 (La.App. 3rd Cir.1985). This court opined that defendant’s unjustified killing of his spouse warranted the maximum sentence.
In the case sub judice, the brutal nature of the crime warrants the maximum sentence. Viewing the victim’s body at the crime scene, Dr. Jones observed multiple points of trauma to the head, face, arms, and neck. He opined that the multiple injuries were not consistent with one fall to the floor and that the cause of death was either manual strangulation or trauma to the head. The autopsy by Dr. Stephens revealed a fractured skull (sphenoid bone), significant hemmorrhage near the victim’s left eye, and a compression of tissue in the neck area indicative of manual strangulation. Dr. Stephens opined that the extent of trauma to the victim’s body resulted from multiple blows and not from striking the victim’s head only twice to the floor. Only Dr. Norman, who neither examined the victim’s body nor viewed any of the autopsy photographs, found no evidence of strangulation.
We agree with the sentencing court’s conclusion that anything other than the maximum sentence of 21 years at hard labor would deprecate the seriousness of this offense. We do not find the sentence so disproportionate to the crime committed, in light of the harm caused to society, as to shock our sense of justice.
For the foregoing reasons, defendant’s sentence is affirmed.
AFFIRMED.