633 So.2d 773 (1994)
STATE of Louisiana
v.
Billy Albert THORNE.
No. 93-KA-859.
Court of Appeal of Louisiana, Fifth Circuit.
February 23, 1994.
*775 Bruce G. Whittaker, 24th Judicial District, Indigent Defender Bd., Gretna, for appellant/defendant Billy Albert Thorne.
John M. Mamoulides, Dist. Atty., Michael Reynolds, James Maxwell, Dorothy A. Pendergast, Asst. Dist. Attys., Research and Appeals, Gretna, for appellee State.
Before BOWES, WICKER and CANNELLA, JJ.
CANNELLA, Judge.
Defendant, Billy Albert Thorne, appeals from his conviction of two counts of second degree murder. He was sentenced to life imprisonment, without benefit of parole, probation or suspension of sentence on each count, to run consecutively. We affirm the conviction, amend the sentence, and affirm as amended.
On November 14, 1991, defendant was indicted by a grand jury for the first degree murders[1] of his estranged wife, Doris Thorne, and her alleged boyfriend, Bruce Hildago. Defendant was arraigned on December 12, 1991 and pled not guilty and not guilty by reason of insanity. The indictment was amended on the day of trial, June 22, 1993, to second degree murder[2] and to designate the victim in count one as Doris Thorne and in count two as Bruce Hildago. Defendant entered a plea of not guilty in response. Trial began that day before a twelve person jury and concluded on June 23, 1993, with verdicts of guilty on both counts. On June 29, 1993 defendant was sentenced to life imprisonment, without parole, probation or suspension of sentence, on each count, to run consecutively.
On October 12, 1991, at approximately 6:30 p.m., defendant was sitting with friends, Daniel Kuras, John Kazmierczak and Henry Duemmling, in the lounge at the Gulfview Hotel in Grand Isle, Louisiana. The only other person in the lounge was Peggy Smith, the bartender. Defendant was scratching off lottery tickets, drinking beer and watching television. Doris Thorne, defendant's estranged wife, entered the bar with a man named Bruce Hidalgo. Peggy Smith waited on them and told Doris Thorne that defendant was at the other end of the bar. Peggy Smith knew that defendant had some items that Doris Thorne had requested from him. Doris Thorne came to where defendant was sitting and they spoke for a few minutes in a normal tone. Then, they left and went outside, apparently to get Doris Thorne's things. A few minutes later, Doris Thorne, carrying two bags, returned to her place at the bar. Defendant entered a few minutes later and shot Hidalgo from behind and again as he lay on the floor. Doris Thorne, who was standing next to Hidalgo, screamed, "My God Billy, what are you doing, are you crazy?" When Hidalgo fell to the floor, defendant turned the gun towards Doris Thorne and shot her several times. Both victims died at the scene due to their gunshot wounds.
Peggy Smith testified that neither defendant nor Doris Thorne raised their voices while talking in the bar. When defendant returned and began shooting, Peggy Smith dove behind the bar for protection. After the shooting stopped, defendant placed the gun on the bar and Peggy Smith looked up. Defendant calmly asked her to call the police and she complied.
Henry Duemmling was also in the lounge when the shooting occurred. He testified that, after Doris Thorne came into the bar, she had a conversation with defendant, then left with him. He testified that Doris Thorne then returned carrying some bags. Suddenly, he heard a noise that he thought was a firecracker. He turned around, saw defendant shoot Bruce Hidalgo a second time and grab Doris Thorne. At that point he fled from the scene with John Kazmierczak.
John Kazmierczak testified that he overheard defendant ask Doris Thorne if Bruce Hidalgo was her boyfriend. He heard Doris *776 Thorne responded "Yes". The rest of his testimony was similar to that of Peggy Smith and Henry Duemmling.
Daniel Kuras was in the lounge parking lot, near defendant's automobile, talking to the bar owner when he saw defendant enter his vehicle, bend over and leave the automobile carrying a gun by his side. Kuras watched defendant enter the lounge and through the open door saw defendant raise his hand and shoot Bruce Hidalgo.
Other prosecution witnesses included Lieutenant Calvin Encalade, who responded to the call about the shooting, and Police Chief Roscoe Besson, who also came to the scene. When Encalade arrived, defendant, who was seated at the bar, stood up, put his hands in the air and said, "I give up". He stated that while in the police car, defendant said, "What did I do? I shot the woman I love." Chief Besson testified that defendant, calmly and without crying, admitted that he killed the victims. Chief Besson testified that defendant stated that "his wife would not fuck around on him again and that Hildago would not fuck anybody else's wife."
At trial, defendant testified that he and his wife knew each other fourteen years, but had been married for three years, when she left him a short time before the shootings. He stated that three weeks prior to the incident, his wife called him and said that she needed certain items from their home. Defendant had these items with him on October 12, when he claimed he was to report to work in Grand Isle for his offshore job. Prior to going to work, defendant stopped at the Gulfview Lounge. He testified that while he was there his wife entered the bar with a man and they sat down. Shortly after, Doris Thorne came over and spoke to defendant. In answer to his question, she said that the man with her was her boyfriend. Then, defendant and Doris Thorne went outside to get her things.
Defendant further testified that when they were outside, he asked his wife if she was sleeping with her boyfriend. According to defendant, Doris Thorne, "told me she was graphically and told me that, that he was good and turned and walked in the bar." Defendant testified that he "just lost my head ..." and felt as though he were "kicked in the stomach," and that he had "never felt anything like that before."
Defendant testified that he did not remember anything else until he discovered himself standing in the bar with a gun in his hand and Doris Thorne on the floor. He stated that he did not remember walking back into the bar and shooting the victims. When asked, defendant admitted being familiar with guns and further admitted that his blackout during the shootings was the first he ever experienced.
On appeal, defendant asserts that the evidence presented at trial was insufficient to support a verdict of guilty of second degree murder and that, at most, the evidence supports the responsive verdict of guilty of manslaughter. Defendant also requests a review of the record for patent error.
Defendant contends that there was insufficient evidence to support his conviction of second degree murder and that, at most, the evidence supports the responsive verdict of guilty of manslaughter. He argues that any rational trier of fact could have found that the mitigatory factors to support the responsive verdict were established by a preponderance of the evidence. Specifically, defendant argues that he was provoked when his wife "arrived with a new man in tow," and she told defendant that she was sleeping with this man and that this man was "good" in bed. He further argues that this "news" caused "him to lose control, grab his pistol and start shooting."
In evaluating the sufficiency of the evidence, the standard to be used by the appellate court is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant guilty, beyond a reasonable doubt, of every element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305, 1308-1309 (La. 1988); State v. DiLosa, 529 So.2d 14, 21 (La.App. 5th Cir.1988), writ denied, 538 So.2d 1010 (La.1989).
*777 In this case, defendant was charged with and convicted of two counts of second degree murder, La.R.S. 14:30.1. The pertinent part of the statute provides:
A. Second degree murder is the killing of a human being:
1) When the offender has a specific intent to kill or to inflict great bodily harm.
Thus, the State must show that defendant, 1) killed the victim and 2) that defendant had the specific intent to kill or to inflict great bodily harm. State v. Gibson, 529 So.2d 1347, 1351 (La.App. 5th Cir.1988), writ denied, 536 So.2d 1212 (La.1989).
At trial, the witnesses at the scene testified that defendant shot the victims. Dr. Fraser MacKenzie, the expert pathologist, testified that the victims died of gunshot wounds. Furthermore, at trial, defendant conceded that he killed the victims with a handgun. Discharging a firearm aimed directly at the victims is indicative of intent to kill or inflict great bodily harm. State v. Robinson, 598 So.2d 407, 410 (La.App. 5th Cir.1992). Thus, the State presented sufficient evidence to show that defendant killed the victims and that defendant had the specific intent to kill or inflict great bodily harm. However, homicide committed in sudden passion or heat of blood, immediately caused by provocation sufficient to deprive an average person of self-control and cool reflection, is manslaughter. La.R.S. 14:31. The presence of "sudden passion" or "heat of blood" distinguishes manslaughter from murder, but are not elements of the offense. Rather, they are mitigatory factors, in the nature of a defense, which exhibit a degree of culpability less than that present when the homicide is committed without them. Robinson at 410; State v. Lombard, 486 So.2d 106, 110-111 (La.1986), appeal after remand, 501 So.2d 889 (La.App. 5th Cir.), writ denied, 506 So.2d 504 (La.1987). When the preponderance of the evidence shows that a homicide was committed in "sudden passion" or "heat of blood", which would have deprived an average person of his self control and cool reflections, a jury errs in returning a verdict of second degree murder. State ex rel. Lawrence v. Smith, 571 So.2d 133, 136 (La.1990), appeal after remand, 584 So.2d 334 (La.App. 3rd Cir.), writ denied, 586 So.2d 566 (La.1991).
In reviewing a claim that defendant proved the presence of the mitigating factors by a preponderance of the evidence, the appellate court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Lombard, at 110-111, Robinson, at 410.
Defendant argues that the mitigatory factors were established by his testimony that Doris Thorne told him "graphically" about sleeping with Bruce Hidalgo. However, the testimony of the witnesses to the incident is consistent that defendant remained calm throughout the period leading to the shooting. He never raised his voice or appeared upset. Even after defendant shot Bruce Hidalgo and Doris Thorne, he remained in full control as evidenced by the fact he laid the weapon on the bar and told Peggy Smith, who was hiding behind the bar, to call the police.
In this case, the only evidence indicating "sudden passion" or "heat of blood" is defendant's statement to Chief Besson that "his wife would not fuck around on him again and that the gentlemen would not fuck anybody else's wife." This statement does not indicate defendant's emotional status at the time of the shooting. Furthermore, even if defendant shot the victims in response to a statement by defendant's wife about her sexual relationship with Bruce Hidalgo, this information, in and of itself, is insufficient provocation to deprive a reasonable man of self control to the point that he would commit murder. Notably, defendant had been married twice before and divorced twice. Viewing the evidence in the light most favorable to the prosecution, we conclude that the jury could have reasonably found that the mitigatory factors were not established by a preponderance of the evidence.
The facts of the instant case are similar to those in State v. Quinn, 526 So.2d 322 (La. App. 4th Cir.1988), writ denied, 538 So.2d 586 (La.1989). In Quinn, the defendant beat *778 his live-in girlfriend to death when she received a telephone call from a man whom Quinn believed was her lover. After beating her, Quinn told his brother that he had "lost his head" and that he knew he had done something wrong. In that case, the Fourth Circuit found that even a telephone call made by a suspected lover was insufficient provocation to deprive a reasonable man of self control to the point that he would commit murder.
We distinguish, on the facts, State v. Lombard, cited as authority by defendant. In Lombard the victim punched defendant, threw him against a metal rail, knocked him to the ground and held him in a stranglehold. In order to free himself, defendant pulled a knife and stabbed the victim. The Louisiana Supreme Court reduced Lombard's second degree murder conviction to manslaughter, reasoning that such sudden provocation would have deprived a reasonable man of self control. In the instant case, defendant shot two persons as a result of a possible comment that his wife made about her sexual relationship with the other victim. He was not threatened and he and his wife did not fight, argue or raise their voices. Bruce Hidalgo, the other victim, did not even have any contact with defendant and defendant was calm both before and after he shot the victims. Therefore, we find that defendant failed to show mitigating circumstances to reduce the verdict to manslaughter and the jury did not err in finding defendant guilty of second degree murder of both victims.
Defendant also requests a review of the record for patent error. This court routinely reviews all criminal appeals for errors patent on the face of the record.
La.C.Cr.P. art. 920 provides: "the following matters and no others shall be considered on appeal: 1) An error designated in the assignments of error; and 2) an error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."
For the purpose of an error patent review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. State v. Oliveaux, 312 So.2d 337 (La. 1975), State v. Ducote, 614 So.2d 735 (La. App. 5th Cir.1993).
The commitment here states that defendant was given credit for time served. However, neither the minutes nor the transcript of the sentencing indicate that defendant was given credit for time served. The state, in its brief, concedes that the transcript does not give defendant credit for time served. Generally, when there is a discrepancy, the transcript prevails. See State v. Richard, 525 So.2d 1097, 1101 (La.App. 5th Cir.1988), writ denied, 538 So.2d 609 (La. 1989). La.C.Cr.P. art. 880 requires a court, when imposing sentence, to give a defendant credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence. Consequently, the sentences on the two counts and the minute entry are amended to give defendant credit for time served in actual custody prior to the imposition of his sentences.
Accordingly, the conviction of defendant of guilty of two counts of second degree murder is hereby affirmed. Further, the sentences imposed on defendant and the minute entry are amended to give him credit for time served. The sentence is otherwise affirmed.
CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED.
NOTES
[1] La.R.S. 14:30.
[2] R.S. 14:30.1.