STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA25-754


STATE OF LOUISIANA

V.

BRENTON ANTHONY MILLER



**********

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 21-1457
HONORABLE J. CHRISTOPHER PETERS, DISTRICT JUDGE

**********

LEDRICKA J. THIERRY
JUDGE

**********

Court composed of Van H. Kyzar, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.


CONVICTION AFFIRMED;
SENTENCE VACATED; REMANDED.

**J. Reed Walters**
**District Attorney**
**W. Evans Dorroh, III**
**Assistant District Attorney**
**28th Judicial District**
**P.O. Box 1940**
**Jena, LA**
**(318) 992-8282**
**COUNSEL FOR APPELLEE**
  **State of Louisiana**

**Annette Roach**
**Louisiana Appeals and Writ Service (LAWS)**
**P.O. Box 6547**
**Lake Charles, LA 70606**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT**
  **Brenton Anthony Miller**

**Rémy Voisin Starns**
**Louisiana Appeals and Writ Service (LAWS)**
**301 Main St., Ste. 700**
**Baton Rouge, LA 70825**
**(225) 219-9305**
**COUNSEL FOR DEFENDANT/APPELLANT**
  **Brenton Anthony Miller**

**THIERRY, Judge.**

Defendant, Brenton Anthony Miller, was found guilty by a unanimous jury of second degree murder, a violation of La.R.S. 14:30.1. For the reasons that follow, we affirm Defendant's conviction, vacate Defendant's sentence, and remand for resentencing.

## FACTS AND PROCEDURAL HISTORY

On October 15, 2021, Defendant and his neighbor, Caden S. Madden, engaged in an argument after Mr. Madden's dog scattered trash across Defendant's yard. Mr. Madden allegedly made heated comments regarding Defendant's son, Ian Miller. Defendant, who had been drinking that day after attending a homecoming parade, pulled out a gun, shot, and killed Mr. Madden. Defendant fled the scene and was arrested later that same day in Creola, Louisiana, about thirty to forty miles away.

On November 30, 2021, a LaSalle Parish grand jury returned a bill of indictment charging Defendant with the second degree murder of Mr. Madden, in violation of La.R.S. 14:30.1. Defendant entered a plea of not guilty.

In September 2023, a jury convicted Defendant of second degree murder. Soon thereafter, Defendant filed a pro se Motion for New Trial. At the sentencing hearing in December 2023, Defendant stated that he lacked the mental capacity to stand trial. After a sanity commission was appointed, the trial court determined at the sanity hearing that Defendant was "competent to stand trial" and that he "knew the difference between right and wrong." The trial court later sentenced Defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant's Motion for New Trial was not discussed at the sentencing hearing.

Defendant then filed a pro se Motion for Reconsideration of Sentence, which was orally denied. Defendant appealed to this court, and we vacated the sentence and remanded for disposition of Defendant's motion for new trial and resentencing, if necessary. *State v. Miller*, 24-672 (La.App. 3 Cir. 5/21/25), 416 So.3d 691. After we issued our opinion, Defendant filed a pro se supplemental motion for new trial, which was denied by the trial court, and the trial court again sentenced Defendant to life imprisonment without benefits. Defendant now appeals.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent, which we address in our analysis of Defendant's second assignment of error.

## ASSIGNMENTS OF ERROR

Defendant alleges two assignments of error: (1) the trial court erred in denying his "Supplement Motion for New Trial" because the evidence was insufficient to prove, beyond a reasonable doubt, that he intended to kill or cause great bodily harm to Mr. Madden; and (2) the trial court erred in proceeding with the resentencing hearing in violation of Defendant's right to counsel.

## ANALYSIS

### I. Sufficiency of the Evidence

Defendant's first assignment of error alleges insufficiency of the evidence regarding whether the State proved that Defendant had specific intent to kill or cause great bodily harm to Mr. Madden.

#### A. The Law

The analysis for insufficient evidence claims is well settled:

2

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* [*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)] standard of review. In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371 (internal citations omitted).

Defendant was convicted of second degree murder. Under La.R.S. 14:30.1(A)(1), second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.

Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10. Since specific criminal intent is a state of mind, it may be inferred from the circumstances present in a case and the actions of a defendant in discharging a firearm, or it may be established by direct evidence. *State v. Thorne*, 93-859 (La.App. 5 Cir. 2/23/94), 633 So.2d 773; *State v. Hongo*, 625 So.2d 610 (La.App. 3 Cir. 1993), *writ denied*, 93-2774 (La. 1/13/94), 631 So.2d 1163; *State v. Dixon*, 620 So.2d 904 (La.App. 1 Cir. 1993); *State v. Navarre*, 498 So.2d 249 (La.App. 1 Cir. 1986).

## B.    The Evidence

At the time of the shooting, Defendant lived in the Goodpine community in Jena, Louisiana, with his daughter, Lacy Miller, and son, Ian Miller. Miss Miller, who was twelve years old at the time of the shooting, attended a homecoming parade

3

on October 15, 2021, with Defendant. She testified that Defendant stopped at a drive-thru daiquiri shop on the way and ordered a drink.

After returning home, Mr. Madden's dog scattered litter from Defendant's trashcan across the yard. Miss Miller testified that Defendant walked across the street to Mr. Madden's house and asked him to pick up the trash. As Mr. Madden did so, Miss Miller played with his dog. Shortly thereafter, Miss Miller observed an argument between Defendant and Mr. Madden, although she could not hear what was said. She testified that they were "up on each other," when Defendant told Mr. Madden to take his "last breath," pulled out a gun, and shot him in the head. According to Miss Miller, Mr. Madden was unarmed and made no threats or aggressive movements.

At the time of the shooting, Miss Miller's brother, Ian Miller, was in the bathroom. Miss Miller told him their father had shot someone, and he went outside and found Mr. Madden's body. She testified that Defendant then asked both children to shoot him so he would not face consequences, but they refused. Miss Miller stated Defendant next tried to give her a knife to stab the victim, and when she refused, he gave the knife to Ian Miller, who stabbed the victim before later placing the knife in the victim's hand.

Miss Miller also testified that Defendant gave her his credit cards and called the nanny to pick up the children. After Defendant was arrested, Miss Miller and Defendant communicated a few times through phone calls and Zoom. Miss Miller testified that about a week before the trial, they had a call which ended with Defendant hanging up on Miss Miller. She explained it was "[b]ecause he got mad at me because I was coming here," meaning coming to testify. She also said Defendant asked her to testify falsely that her brother committed the crime.

4

Ian Miller, who was thirteen at the time, testified that Defendant drank a few shots of alcohol while at the homecoming parade. After the parade, he heard a gunshot while in the bathroom. Mr. Miller testified:

> My sister came in and said that my dad shot somebody. I thought it was a joke. I got dressed. I came out of the bathroom. My dad came in and I asked my dad, did you actually shoot somebody? He said, go check outside. I checked the front and the back. I checked the back and there was a dead body.

After discovering the victim's body and recognizing the body as a neighbor, Mr. Miller testified Defendant asked him and his sister to shoot him and then instructed them to put a knife in the victim's hand. The knife was from the kitchen, and Defendant had given it to Mr. Miller. Mr. Miller stabbed the victim's body because he thought that was what Defendant wanted him to do; but "[Defendant] went outside after that," Mr. Miller testified, "and looked and he said, that's not what I meant. I meant for you to set it down not put it, not stab him." Mr. Miller then put the knife in the victim's hand. After, Defendant gathered his belongings, told the children they would never see him again, and left. Mr. Miller identified Defendant in court as his father.

Jimmy Arbogast was the Chief Criminal Deputy at LaSalle Parish Sheriff's Office at the time of the incident. He testified that on the night of October 15, 2021, he was dispatched to Goodpine with notice that one neighbor had shot another. In the yard, he, along with two other deputies, saw the body of a white male lying close to a mobile home. The body had a single gunshot wound to the head, with cuts on the right wrist. A bag of garbage was on the right arm, and a bloody, stainless-steel knife was on the victim's left palm. Deputy Arbogast learned that Defendant's children ran to a neighbor's house and told the neighbor about the shooting. This neighbor was Keith Andrews, and he called the police after speaking with the kids.

Defendant, according to Deputy Arbogast, was later found in Creola, Louisiana, which was about thirty to forty miles away in Grant Parish.

The lead investigator, Detective Richard Smith, testified that the knives collected from Defendant's residence shared similar characteristics to the one found in the victim's hand. In Defendant's residence, .38 caliber ammunition was found in the master bedroom and on a shelf in the master bathroom. According to Detective Smith, Deputy Jordan Mayo secured a .38 revolver when he arrested Defendant at a traffic stop in Creola. After Defendant was detained and his clothes removed, his shorts and shirt were suspected to have blood stains.

Keith Andrews lived behind Defendant. He testified that on the evening of October 15, 2021, Defendant and his son, Mr. Miller, and another boy named Tony visited his house. Defendant was holding a cane and wearing his back brace. He smelled like alcohol. Then he displayed his gun to Mr. Andrews. Mr. Andrews testified, "It looked to be like a .38 or something." On cross-examination, Mr. Andrews noted that Defendant did not appear to know how his gun worked, but he knew that pulling the trigger would load another round.

Defendant then left with the gun, and Mr. Andrews did not see him until later that evening. Mr. Andrews and his wife were eating dinner, and they heard someone at the door. "And we opened the door," Mr. Andrews testified, "and [Defendant's children] come running in all excited and said dad had shot a man and he was dead over in the yard." So Mr. Andrews got into his car, and as he backed out of the driveway and drove around to Defendant's house, he saw Defendant cut through his yard and across a ditch and drive off down the road. Mr. Andrews followed Defendant but lost him, but testified that Defendant said "he wasn't going back to jail, and he was going to kill his self [sic]."

6

On the last day of his trial, Defendant testified. His testimony often contradicted the testimony of his children. He said that when he and his kids got back from the parade and he saw the yard was torn up, he asked his son, Ian, to pick up the garbage. However, Ian Miller refused. So Defendant called the victim, Mr. Madden, and told him that his dog had gotten into the garbage. "And [Mr. Madden]," Defendant testified, "just, like, blew up, saying that his dog didn't do that. And the dog had came over and growled at me, and stuff. And I was scared the dog was going to possibly bite me." Sometime later, Defendant saw Mr. Madden return home. He said, "I told Ian . . . well, if you ain't [sic] going to pick it up, go let [Mr. Madden] know." Then Defendant left to buy a daiquiri and cigarettes. However, when he returned home, the trash was still in the yard. Defendant testified:

> So I took and put my stuff inside and came back outside and me and Lacey, Lacey went over. I told Lacey to go get [Mr. Madden] and Lacey went and got him and he came over and he started helping me pick up the trash on the front yard and he went back home. And whenever he went back home, I went inside and grabbed me a cigarette and come back outside and I walked around the front of the trailer and he was in my backyard and he had a bag in his hand. And I just asked him what he was doing back there because I thought he was done on it. And he just said that I need to watch myself and that my son needs to stop cursing or he's going to whip his ass again. And I'm like, do what? What you talking about? He said, he, he was like, I'll kill you and your kids. And I'm like, no you're not. And I just, I had my gun on me so I just pulled it out to scare him. And whenever I pull [sic] it out and go up my hand is on the hammer thing and he shoves me. And whenever he shoves me, my finger slipped off the hammer and the gun went off.

Defendant said that when it went off, the gun was "real close," and his daughter, Miss Miller, was to his right. Defendant testified, "And, like as soon as she, as soon as [Mr. Madden] shoved me, [Miss Miller] ran up and like, grabbed me from falling down." Defendant denied that anyone ever said, "Breathe your last breath, you're about to die," as his daughter, Miss Miller, claimed in her testimony.

7

Defendant testified that not long before the shooting on October 15, 2021, he had back surgery because he had blown out his back. Because of this, he had to carry a cane and wear a back brace. Defendant testified that he bought a gun because he was "getting threatened" by his children's mom and his cousin. Defendant denied any intent to shoot Mr. Madden, explaining, "No, I was just trying to scare him to make him leave." He also said he did not know how to operate the weapon. When asked why he left after shooting Mr. Madden, Defendant said, "I just panicked. I had to clear my mind, I guess." Defendant also said he did not tell anybody to stab Mr. Madden, nor did he ask anyone to shoot him. He testified that during his argument with Mr. Madden, he was scared. "I was in fear for my life[,]" Defendant said, "where, I'm gonna possibly paralyze me."

Despite having several large daiquiris and shots on the day of the incident, Defendant testified that he was not drunk. Defendant acknowledged that his son and daughter testified truthfully regarding how he gave them his personal belongings before leaving the scene. They also testified truthfully about how he had hugged them and told them that they were never going to see him again. However, Defendant testified that Miss Miller was a liar "because she want[ed] to stay with her mama" who was "letting her do whatever she wants." Moreover, his son, Mr. Miller, lied when he said that Defendant told him to stab the victim's hand because Mr. Miller "didn't want to get in trouble for whatever he did." Nevertheless, when pressed about why Mr. Miller was worried about getting in trouble, Defendant said he did not know.

Dr. Frank Peretti, who was accepted as an expert in forensic pathology, described Mr. Madden's wound as "a single gunshot wound to his left temple skull above the ear." He further classified the wound as a "near contact gunshot wound,"

in which there is no stippling and "[t]he muzzle of the gun is not held firmly at the head but it's a short distance away." The distance from the entry wound to the exit wound, Dr. Peretti testified further, was about three inches and traveled in an upward direction.

### C.    *Analysis*

Although Defendant does not deny shooting Mr. Madden, he argues that the evidence only supported a finding of negligent homicide or aggravated assault with a firearm, rather than second degree murder. Specifically, he claims that Mr. Madden's shove is what caused the gun to accidentally discharge, and that such is supported by Dr. Peretti's testimony that the bullet traveled in an upward trajectory. He also claims that the evidence shows he was distraught at the time of the shooting, and had he intended to kill Mr. Madden, he would not have been so distraught over the shooting.

We disagree with Defendant. The jury heard all the testimony and evidence presented and was given the opportunity to hear Defendant's arguments. It is the role of the fact-finder to weigh the respective credibility of the witnesses, and only irrational decisions to convict will be overturned. Moreover, if the interpretation of the evidence most favorable to the State is sufficient to establish all of the essential elements of the crime beyond a reasonable doubt, the conviction will be upheld. *State v. Mussall*, 523 So.2d 1305 (La.1988). While Defendant contends that the evidence did not establish his intent to kill Mr. Madden, we find that the evidence, when viewed in the light most favorable to the State, is more than sufficient.

In *State v. Bailey*, 95-78 (La.App. 3 Cir. 11/2/95), 664 So.2d 665, *writ denied*, 96-609 (La. 6/21/96), 675 So.2d 1077, the defendant, standing about twenty feet away from the victim, shot her in the forehead using a .22 rifle outfitted with a scope.

At trial, evidence was introduced showing the rifle's scope was inaccurate and sat loosely on the front mount. Because of this and because some testimonial evidence suggested the defendant did not have the intention to shoot the victim, the defendant claimed he shot the victim accidentally. Thus, he did not have the specific intent to kill. *Id.* However, this court rejected that claim, stating that although there may have been some evidence of an accidental shooting, there was much evidence showing that the defendant specifically intended to kill or cause great bodily harm to his wife. Specifically, the court noted that the defendant told the victim that, "Today seems like a good day to die," and "Turn around and look at the man that's going to send you to the your mother-fucking maker," right before shooting her in the head. *Id.* at 672. The court found there was sufficient evidence to find the defendant guilty of second degree murder.

Here, concerning Defendant's intent, the trial evidence did not indicate that Defendant shot Mr. Madden accidentally. First, the only eyewitness, Defendant's daughter, testified that Defendant told Mr. Madden to take his last breath, pressed the gun to his forehead, and shot him. At trial, Defendant denied doing this and even suggested his daughter was a liar. However, the evidence suggests otherwise. It is true that Dr. Peretti found that Mr. Madden's bullet wound was not to the forehead but to the victim's left temple. The bullet wound, moreover, was not a contact wound, and the bullet passed through the victim's skull in an upward trajectory. Nevertheless, Dr. Peretti classified the wound as a loose or near contact wound. In other words, when Defendant fired the revolver, its muzzle was held, at most, an inch from Mr. Madden's head. From this fact, it is likely that the jury rationally concluded that Defendant, rather than accidentally firing from being shoved, brought

10

the gun close to the victim's head and fired. This is so even when considering the upward trajectory.

Additionally, though claiming the shooting was accidental, Defendant tried to cover up the shooting by essentially portraying the shooting as an act of self-defense. Defendant's son testified that after the shooting, Defendant had him plant a knife in the victim's hand. Of course, Defendant denied doing this and claimed his son was a liar. However, the cuts to the victim's wrist supported Mr. Miller's testimony regarding how he incorrectly thought Defendant wanted him to stab the victim.

Finally, Defendant fled the scene. Although Defendant claimed he was distraught and fled to clear his head, his head was clear enough for him to give his credit cards to his children before he fled. Driving away, he cut through his yard and over a ditch and took off down the road. Upon meeting Mr. Andrews, he said he was not going to go back to jail. Furthermore, he was arrested in a different parish about thirty to forty miles away. With these facts, it is the fact-finder's duty to conclude whether these were the actions of a man who accidentally killed a person or of a man trying to flee after committing murder. The jury's conclusion of the latter was certainly rational.

Viewed in the light most favorable to the State, this evidence supports a rational finding that Defendant intentionally killed the victim. This assignment of error is without merit.

## II.     Right to Counsel at Resentencing Hearing

Defendant alleges in his second assignment of error that the trial court erred by proceeding with the resentencing hearing without affording him the right to counsel, or by first obtaining an explicit and informed waiver of counsel. Because

he claims he was denied his right to counsel, he asks this court to vacate his sentence and remand for a new sentence proceeding.

The right to counsel is fundamental and identified in both the Louisiana Constitution and the United States Constitution:

> Louisiana Constitution Article I, § 13, recognizes the right to the assistance of counsel at every stage of the proceedings against a person accused of a crime. *State v. White*, 325 So.2d 584, 585 (La.1976). Likewise, the constitutional right to the assistance of counsel provided by the Sixth Amendment of the United States Constitution mandates the right, unless waived, to the assistance of counsel at every critical stage of the proceedings, including an initial or deferred sentencing. *McConnell v. Rhay*, 393 U.S. 2, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968). Unless a defendant has made a knowing and intelligent waiver of his right to counsel, any sentence imposed in the absence of counsel is invalid and must be set aside. *State v. Williams*, 374 So.2d 1215, 1217 (La.1979).

*State v. Flowers*, 598 So.2d 1144, 1146 (La.App. 1 Cir. 1992); *see also State v. Dupas*, 94-1264 (La.App. 3 Cir. 3/6/96), 670 So.2d 667.

Additionally, a "sentence imposed without the presence of the defendant's attorney is illegal and of no effect, for certain vital issues cannot be raised and important rights may be lost if not raised or exercised prior to this stage of the proceedings." *State v. Simon*, 23-643, p. 4 (La.App. 1 Cir. 12/27/23), 380 So.3d 674, 677.

Here, the minutes indicate counsel was present at Defendant's resentencing hearing, but the hearing transcript states that Defendant appeared pro se. The transcript does not indicate that Defendant made a valid waiver of counsel. The State admits in brief that when there is a discrepancy between the transcript and the minutes, the transcript prevails. *State v. Lynch*, 441 So.2d 732 (La.1983). Consequently, since the State does not dispute that a defendant should either have

12

counsel at all critical stages of a criminal proceeding or should explicitly waive counsel, the State suggests remand would be an appropriate remedy.

Therefore, we vacate Defendant's sentence and remand the case to the trial court for resentencing.

## DECREE

For the foregoing reasons, we affirm Defendant's conviction, vacate Defendant's sentence, and remand the matter to the trial court for resentencing, permitting Defendant to either have counsel present or explicitly waive his right to counsel.

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED.**